# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-00361-02** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **WILLIE ELMORE** | : | |

## MEMORANDUM

Presently before the court are defendant Willie Elmore's ("Elmore") motions to suppress evidence. (Docs. 30–33). Elmore contends that, on September 16, 2011, law-enforcement officials stopped his vehicle, unlawfully arrested and searched him without probable cause to do so, and obtained a search warrant for the vehicle only as a result of that unlawful arrest and subsequent search. (Doc. 30). Elmore further contends that search warrants issued for various cell phone records were obtained as a result of the September 16, 2011 arrest and search and are thus inadmissible as fruits of an illegal search. (Docs. 31–33). The court conducted an evidentiary hearing on the motions on March 28, 2012. For the reasons that follow, the court will deny the motions.

## I. Findings of Fact[1]

On September 16, 2011, at approximately 9:52 a.m., two masked men robbed the Fulton Bank located at 2220 Old Trail Road, in Etters, Pennsylvania. (Doc. 40–1, 13). Witnesses described the robbers as two black males, as least one of whom

---

[1] The court's findings are based upon the court's assessment of the credibility of the testimony and information provided at the March 28, 2012, hearing on the motions.

was armed. (Id. 13–14). Bank employees described the first robber as wearing a black hooded sweatshirt, a black bandana, clear latex gloves, and blue jeans. (Id. 13). Employees described the second robber as wearing a brown jacket, black baseball hat with a red brim, white tee-shirt over his face, clear latex gloves, and blue jeans. (Id. 13). The robbers fled with $13,761, including ten $20 bills designated as "bait money."[2] (Id. 14).

Around the time of the robbery, Suzanne Stabley ("Stabley"), drove up to the Old Trail Road Fulton Bank to cash a paycheck. (Doc. 66, at 4). She observed a black Chevrolet Blazer parked in an odd location, and saw a man with a covered face exit the passenger side of the vehicle and enter the bank. (Id. at 5). Suspecting that the bank was being robbed, Stabley drove around the perimeter of the bank and exited the parking lot. (Id.) Stabley parked along the curb, and was able to observe a partial Pennsylvania license plate number for the vehicle. (Id. at 6).[3] While she was doing this, she observed another man exit the vehicle and enter the bank. (Id. at 5). Stabley then drove across the street to Rutter's Farm Store to obtain a pen to write down the partial plate. (Id. at 6). As Stabley parked, a friend of hers pulled into the parking space to the right of her vehicle. (Id.) They entered

---

[2] Banks often record the serial numbers of a few bills, known as "bait money," which they can track if stolen. The bait money stolen during this robbery had serial numbers EK50818150B, IC48514590C, IG77104102B, IL88303161D, IE57476455D, AF62918762A, AC56722855D, BB69048686A, AF87830128C, and AF 72190882F.

[3] Stabley was able to determine that the plate began with "G" and ended with "V-3245" but could not determine what was between the G and V.

Rutter's and asked for a pen, which Stabley used to write down the partial plate number on a Rite-Aid advertisement she had in her vehicle. (Id. at 6, 13). Stabley pointed out to her friend the vehicle, which was still at the bank, identifying it as a Chevrolet Blazer. (Id. at 6).

At some point shortly thereafter, the Blazer exited the Fulton Bank parking lot. (Id.) Stabley then observed two police cruisers drive past the bank and another enter the bank's parking lot. Stabley entered her vehicle intending to drive to the bank and give the partial plate to the officer who had just arrived there. (Id. at 6, 7). As she was sitting in line waiting to exit the Rutter's parking lot, she observed a black Chevrolet Blazer pull into the Rutter's parking lot and turn around. (Id. at 7). She was "absolutely, positively sure" that the vehicle in the Rutter's parking lot was the same one she had observed at the bank, identifying it from its color, model, and age. (Id. at 7, 9). She noted that the driver was a "thin black man with a shaved head." (Id. at 14).

Still sitting at the exit of the Rutter's parking lot, Stabley waved the Blazer around her, hoping to obtain the vehicle's full license plate. (Id. at 7, 8). The vehicle passed her, and she observed that it now had a North Carolina license plate.[4] (Id. at 8). The Blazer turned left out of the Rutter's parking lot, and Stabley drove across the street to Fulton Bank to tell the police officer present about the vehicle. (Id. at 8, 15). Stabley, who did not have a pen, continually recited the

---

[4] The North Carolina plate, AAP2259, was registered to the defendant, Willie Elmore.

3

North Carolina plate to herself until she was able to provide it to the police officer at the bank. (Id. at 8). Stabley provided Sergeant Steven Lutz ("Sgt. Lutz"), the first officer she encountered, with the North Carolina license plate number of the Blazer, briefly explaining its significance. (Id. at 9; Doc. 40–1, at 13). Sgt. Lutz recorded the North Carolina license plate. (Doc. 40–1, at 13). [5]

Sometime after the robbery, but before 11:20 a.m. on September 16, 2012, York County Communications issued a "be-on-the-lookout" ("BOLO") advisory, based on the information gathered by Sgt. Lutz. (Id. at 36). The BOLO informed officers in the area of a black Chevrolet S-10 Blazer, North Carolina license plate AAP2259, believed to have been involved in a bank robbery. (Id.) The BOLO stated that the vehicle was occupied by two or more black males, and was last seen heading towards Interstate 83. (Id.) Officer Gerald Wade Heaton ("Officer Heaton"), of the Hellam Township Police Department, was patrolling US 30 in Hellam Township when he received the BOLO. (Id. at 36). He pulled into an emergency crossover, facing south. (Id. at 36, 37).

---

[5] There is some discrepancy as to whether Stabley also provided Sgt. Lutz with the partial Pennsylvania license plate. Sgt. Lutz stated in the Incident Report that Stabley informed him that she drove across the street to Rutter's in order to write down the partial Pennsylvania license plate number she was able to obtain from the black Chevy Blazer, and the Incident Report contains the partial Pennsylvania plate G_V3245. (Id. 13). Stabley, however, testified that she did not inform Sgt. Lutz that there were two license plates, and that she did not give Sgt. Lutz or any officer the partial Pennsylvania license plate until a phone conversation "several months" later. (Doc. 66, at 20–22).

Around 11:20 a.m., Officer Heaton observed a black Chevrolet S-10 Blazer pass his position, traveling eastbound. (Id. at 37). Officer Heaton saw a black male operating the vehicle, and noticed that the vehicle had a North Carolina license plate. (Id. at 37). Officer Heaton began following the vehicle from the left lane and relayed the license plate number to York County Communications, which confirmed that it was the same plate identified in the BOLO. (Id. at 37–38).

Officer Heaton moved into the right lane and continued to follow the vehicle, which at that point had slowed to almost exactly the speed limit of 55 miles per hour. (Id. at 38). Officer Heaton observed the driver frequently glancing in the side mirror, which he found very suspicious. (Id. at 38, 50). Officer Heaton followed the Blazer for approximately 1.5 miles on US 30 until the Blazer reached the Hellam exit. (Id.) At this point the Blazer exited, turned left, took the underpass below US 30, and turned left again to reenter US 30, now traveling westbound. (Id. at 39).

Officer Heaton continued to follow the vehicle, informed York County Communications of the change in direction, and requested back-up. (Id. at 39, 40). Five or six Springettsbury Township police cruisers joined Officer Heaton, and together the cruisers activated their sirens and lights just past the Mount Zion Road overpass, approximately three miles from the Hellam exit. (Id. at 40, 51). The

Blazer stopped, and the officers executed a "felony stop," surrounding the vehicle in a semicircle with weapons drawn.[7]  (Id. at 41, 54).

A Springettsbury Officer instructed the driver, later identified as Willie Elmore, to roll down the window, open the driver's side door with his left hand, exit the vehicle, walk backward toward the officer, and lie down on the roadway.  (Id. at 41, 55).  Elmore complied with all of these instructions.  (Id. at 55).  Officer Heaton placed handcuffs upon Elmore and a Springettsbury Township officer arrested him. (Id.; Doc. 40–1, at 30).  Officer Heaton and another officer conducted a pat down of Elmore's person.  (Doc. 66, at 55).  Officer Heaton removed a number of $20 bills from Elmore's right pocket, six of which were later determined to be bait money from Fulton Bank.  (Id. at 42; Doc. 40–1, at 15).  In addition, officers observed currency in plain view on the vehicle's right front passenger seat, and sticking out of the center consol.[8]  (Doc. 40–1, at 30).

Based on the evidence gathered during the traffic stop, Sgt. Lutz obtained a search warrant in order to thoroughly inspect the vehicle.  (Doc. 30–1).  This warrant was executed on September 16, 2011.  (Id.)  Among the items seized from the Chevrolet Blazer were $1,510 and a Motorola cell phone.  (Id.)  Sgt. Lutz

---

[7] The felony stop was conducted to ensure officer safety, as the BOLO stated the vehicle was involved in an armed bank robbery and the officers could not be sure how many people were in the vehicle and whether they were armed.  (Id. at 57, 58).

[8] Upon the search of the vehicle, $54 was seized from the right front passenger seat and $22 from the center console. (Doc. 40–1, at 30).

6

obtained a second warrant, executed on September 22, 2011, to search the phone in order to gain information related to the robbery. (Doc. 31–1). As a result of the information obtained from this warrant, Sgt. Lutz procured additional warrants to search telephone records: one for the number registered to the phone taken from the Blazer and a second for a number that the phone dialed and received calls from numerous times, both before and after the robbery. These two warrants were executed on September 22, 2011 and September 28, 2011, respectively. (Docs. 32–1, 33–1).

## II. **Procedural History**

On December 20, 2011, a grand jury returned a two-count indictment against Elmore and co-defendant Tristan Green charging them with: (1) taking money by force, violence, and intimidation, from a bank, and assaulting and putting in jeopardy the life of a person by use of a firearm, in violation of 18 U.S.C. §§ 2213(a),(d); and (2) possessing and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 1). On January 17, 2012, Elmore entered a plea of not guilty. (Doc. 29). He filed the instant motions to suppress (Docs. 31–34) on February 1, 2012. The court conducted an evidentiary hearing on the motions on March 28, 2012. (Doc. 66). The motions have been fully briefed and are ripe for disposition.

### III. **Discussion**

Elmore contends that the arrest and search of his person and the seizure and subsequent search of the vehicle were unlawful. He further contends that all evidence gained as a result of the original arrest and search is inadmissible against him, and any evidence obtained pursuant to the four search warrants obtained by Sgt. Lutz must be suppressed as "fruit of an illegal search." See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963) (noting that "evidence seized during an unlawful search [can] not constitute proof against the victim of that search" and that "[this] exclusionary prohibition extends as well to the indirect as the direct products of such invasions." (citing Weeks v. United States, 232 U.S. 383 (1961), Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)).

#### A. **Legality of the Investigative Stop**

Elmore does not appear to contest the legality of the initial stop of his vehicle. However, in order to properly address whether the arrest and various searches and seizures made after the traffic stop were lawful, the legitimacy of the investigative stop must be established.

Law enforcement officials may make an investigative stop when they have a "reasonable suspicion" of wrongdoing. See Terry v. Ohio, 392 U.S. 1, 20-21 (1968); see also United States v. Hensley, 469 U.S. 221, 226 (1985). The reasonable suspicion standard is less onerous than probable cause. United States v. Mathurin, 561 F.3d 170, 173-74 (3d Cir. 2009). Under Terry, an officer is permitted to stop a vehicle "when the officer has reasonable, articulable suspicion that [one or more of

8

its occupants] ha[ve] been, [are], or [are] about to be engaged in criminal activity." United States v. Place, 462 U.S. 696, 702 (1983); see also Mathurin, 561 F.3d at 174.

Tips from ordinary citizens can sometimes give officers reasonable suspicion, or even probable cause, to execute a forcible stop, search, and/or seizure. Alabama v. White, 496 U.S. 325, 328 (1990). Courts must look at the "totality of the circumstances" surrounding an informant's tip in order to assess its sufficiency to establish either probable cause or reasonable suspicion. Illinois v. Gates, 462 U.S. 213, 230 (1983). The informant's "'veracity,' 'reliability,' and 'basis of knowledge'" are relevant factors in making such an evaluation. White, 496 U.S. at 328-29.[9]

In the present case, the information Stabley provided to Sgt. Lutz was more than sufficient to establish reasonable suspicion to conduct a stop of the black Chevrolet S-10 Blazer. Stabley provided the information about the vehicle and North Carolina license plate to Sgt. Lutz face-to-face. (Doc. 40–1, at 13). The police

---

[9] See also United States v. Johnson, 592 F.3d 442, 449 (3d Cir. 2010) (stating that "several factors inform [the Court's] assessment of the reliability of an informant's tip, including whether: (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) the informant can be held responsible if her allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant has recently witnessed the criminal activity at issue; and (5) the witness's information accurately predicts future activity").

9

recorded her name and biographical information either during or shortly after the initial interview.[10] She had witnessed firsthand the position of the vehicle in the bank parking lot, two men with covered faces exiting the vehicle and entering the bank, and then saw what she was certain was the same vehicle shortly thereafter in the Rutter's parking lot. (Doc. 66, at 5, 7). Unlike most informant-tip cases involving vehicles—where informants are only able to provide a general description of the vehicle (such as color, make, and model)—Stabley was able to provide the vehicle's license plate number, thereby uniquely identifying the vehicle. (Id. at 8). All of these factors, considered in their totality, establish, at minimum, reasonable suspicion to believe that the occupant or occupants of the black Chevrolet S-10 Blazer with North Carolina license plate AAP-2259 had been involved in the September 16, 2011 robbery of Fulton Bank.

The discrepancy between Sgt. Lutz's incident report and Stabley's testimony concerning when Stabley provided police with the partial Pennsylvania plate does not alter the court's conclusion. (See Doc. 40–1, at 13; Doc. 66, at 20). Ultimately, it was the North Carolina plate, provided in full by Stabley, that was noted in the BOLO issued by York County Communications that morning. (Doc. 66 36:10–21). It was that North Carolina license plate that Officer Heaton identified on the vehicle. (Id. 38:2–5). The exact moment at which police received Stabley's account of the

---

[10] The record does not include the precise moment at which Stabley provided her biographical information, but her name, phone number, and address were noted on the incident report (Doc. 40–1, at 11), and Sgt. Lutz indicated that he knew her name by the evening of September 16, 2011. (Id. at 13).

10

partial Pennsylvania license plate is irrelevant to the actual initiation and execution of the traffic stop, the arrest, and any subsequent searches and seizures.

**B.    The Arrest**

Elmore's main argument to suppress evidence (Doc. 34; see also Docs. 30-33) is that police did not have probable cause to arrest him after his vehicle was stopped, thus rendering the arrest and subsequent searches of his person and car unlawful. (Doc. 34, at 5).

A police officer may arrest the occupant of an automobile, without a warrant, when that officer possesses probable cause "sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it." United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002). Like reasonable suspicion, "[p]robable cause is determined by the 'totality of the circumstances.'" Id. (explaining that the court "must assess the 'knowledge and information which the officers possess at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest' in determining if probable cause existed"). An officer may rely on inferences based on experience, as well as facts, in determining whether probable cause exists. Ornelas v. United States., 517 U.S. 690, 700 (1996).

Innocent behavior can, as part of the totality of circumstances, form the basis for probable cause. Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) (noting that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts"). Nervous or evasive behavior, even if

11

innocent in itself, "is a pertinent factor" in conducting an analysis of probable cause. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

The Court of Appeals for the Eighth Circuit in United States v. Jones, 535 F.3d 886 (8th Cir. 2008), addressed the validity of an arrest on facts somewhat similar to those of the present case. See id. In Jones, police received eyewitness statements from two tellers, describing a man who had robbed a bank. Id. at 888. Private security guards near the bank soon located a man who matched the tellers' description, and police approached the man on foot approximately thirty minutes after the robbery. Id. at 889. When the man noticed an officer following him, he quickly changed direction. Id. The officer immediately arrested him. Id. The Court determined that the arrest was supported by probable cause based on the eyewitness information, the proximity of the suspect to the bank, and the suspect's nervous behavior. Id. at 890.

As in Jones, the circumstances of this case, evaluated in their totality, constituted probable cause to arrest Elmore at the time his vehicle was stopped. Officer Heaton first noticed a black Chevrolet S-10 Blazer with a North Carolina license plate, and soon confirmed that the license plate was the exact one described in the BOLO associated with the bank robbery. (Doc. 66, at 37, 38). He did so approximately 90 minutes after the robbery, in the county in which the robbery occurred. Elmore behaved in a nervous manner, slowing to exactly the speed limit, repeatedly glancing in the rearview mirror, and exiting U.S. 30 eastbound only to immediately reenter the highway traveling westbound. (Id.) With noted exception

12

of the license plate confirmation, none of these behaviors are incriminating in isolation; however, they are suggestive of wrongdoing when taken in the broader context of the information Officer Heaton and the arresting officer possessed based on the BOLO and their own observations. Elmore's behavior, coupled with the description of the robbers and the fact that the vehicle he was operating had been uniquely identified as the one involved in the bank robbery via an eyewitness account of the license plate number, provided probable cause to make a warrantless arrest.[11]

### C. <u>Subsequent Searches and Seizures</u>

In light of the validity of Elmore's arrest, the legality of the officers' search of Elmore's person, the seizure of his vehicle, and the subsequent search of his vehicle, cell phone, and cell phone records pursuant to the four search warrants (Docs. 30–1 – 33–1) is apparent.

An officer may conduct a search incident to arrest without obtaining a warrant. <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 185 (1990), <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 35 (1979) (noting that "[t]he fact of a lawful arrest, standing alone,

---

[11] Elmore claims that he was arrested "immediately upon [his] vehicle being stopped." (Doc. 34, 4). The government brief appears to claim the arrest was made after the arresting officer "observed money sitting on the front passenger seat." (Doc. 40, 4). The Affidavits of Probable Cause in each of the search warrants state "[t]he vehicle was stopped and the operator was taken into custody. . . Elmore was searched incident to arrest. . . ." (Doc. 40–1, 30). This court finds that the arrest was made either immediately before or immediately after Elmore was handcuffed and before the search of his person or the vehicle. As explained, the court finds that there was probable cause for the warrantless arrest of the vehicle driver.

13

authorizes a search [of a person validly arrested]"). Thus, under the Rodriguez exception to the Fourth Amendment's warrant requirement, the search of Elmore's person incident to his valid arrest was legal. See id., 497 U.S. at 185.

With respect to the four search warrants, a search warrant may be issued by a magistrate when, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. During the search of his person, officers recovered from Elmore's front right pocket twenty-five $20 bills, six of which had serial numbers matching bait money taken from Fulton Bank. (Doc. 40–1, at 15). This fact, as well as the North Carolina license plate and vehicle description provided by Stabley, were included in each of the four warrants' affidavits of probable cause. These facts constituted probable cause to believe evidence of the robbery of Fulton Bank could be found within the black Chevrolet S-10 Blazer, and thus the warrant to search the vehicle (Doc. 30–1) was valid.

During the search of the vehicle, police found a black Verizon Motorola cell phone. (Doc. 40–1, at 16). The facts previously established constituted probable cause to believe the phone was involved in the robbery, and thus the warrant to search the phone (Doc. 31–1) was valid as well. Upon the search of the phone, officers discovered that the phone's number was (347) 628-8506, and that a number of calls were placed to or received from cell phone number (336) 471-8732 prior to and after the robbery of Fulton Bank. (Doc. 32–1, at 2; Doc. 33–1, at 2). This constituted probable cause to believe these phone numbers were involved in the

robbery, and thus the warrants to obtain records of these phone numbers (Docs. 32–1, 33–1) were valid.

**IV.    Conclusion**

For the foregoing reasons, the motions to suppress (Docs. 30–33) will be denied. An appropriate order follows.


     S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      July 16, 2012

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-00361-02** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **WILLIE ELMORE** | : | |

## **ORDER**

AND NOW, this 16th day of July, 2012, upon consideration of the motions to suppress (Docs. 30–33) filed by defendant Willie Elmore, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motions to suppress (Docs. 30–33) are DENIED.

                                                  S/ Christopher C. Conner
                                                CHRISTOPHER C. CONNER
                                                United States District Judge